## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

IN THE MATTER OF THE
ARBITRATION BETWEEN

THE NATIONAL FOOTBALL LEAGUE
PLAYERS ASSOCIATION On Behalf of
Steve Harvey, David Alexander and Marlon
Kerner

and

THE NATIONAL FOOTBALL LEAGUE
MANAGEMENT COUNCIL On Behalf of
THE BUFFALO BILLS and THE NEW
YORK JETS

THE NATIONAL FOOTBALL LEAGUE
PLAYERS ASSOCIATION On Behalf of
Charles Smith, Dusty Renfro, Michael Swift
and Jason Peter

and

THE NATIONAL FOOTBALL LEAGUE
MANAGEMENT COUNCIL On Behalf of
THE CAROLINA PANTHERS

Civil Action No. 08-cv-3658 (PAC)

DECLARATION OF ADAM J.
KAISER IN SUPPORT OF
NFLPA'S AMENDED
PETITION FOR ORDER
CONFIRMING ARBITRATION
AWARD AND ENTRY OF
JUDGMENT THEREON

## DECLARATION OF ADAM J. KAISER

Adam J. Kaiser hereby declares as follows:

1.     I am a member of Dewey & LeBoeuf LLP, counsel for the National

Football Players Association ("NFLPA"), and am admitted to practice in this Court. I

submit this declaration, of my own personal knowledge, in support of the NFLPA's

Amended Petition for Order Confirming Arbitration Award and Entry of Judgment

Thereon.

2.      Attached hereto as Exhibit A is a true and correct copy of Article IX of the Collective Bargaining Agreement ("CBA") negotiated between the National Football League Management Council ("NFL Management Council"), on behalf of the NFL clubs, and the NFLPA, on behalf of all NFL players. Article IX of the CBA mandates that all disputes between the parties involving the interpretation of, application of, or compliance with the CBA or the NFL Player Contract (the standard form contract by which individual NFL clubs employ NFL players) be submitted to final and binding arbitration before a mutually selected arbitrator. Attached hereto as Exhibit B is a true and correct copy of the NFL Player Contract.

3.      On May 17, 2005, the NFLPA, pursuant to Article IX of the CBA, filed a non-injury grievance against the Buffalo Bills, the New York Jets, and the NFL Management Council, asserting that the claims made by the Buffalo Bills and New York Jets for an offset against money paid to NFL Players Steve Harvey and David Alexander, respectively, for the entire amount of the workers' compensation benefits awarded to those players (i.e., a "dollar-for-dollar" offset), violated the express language of Paragraph 10 of the NFL Player Contract and arbitral precedent under the CBA.

4.      In its grievance, the NFLPA argued that Paragraph 10 of the NFL Player contract permits Clubs to take only a limited offset for the amount of workers' compensation benefits due and payable during the same period of time in which a player is deemed to be entitled to his salary under his contract (i.e., a "time" offset).

5.      On September 14, 2005, the NFLPA filed a separate non-injury grievance against the Carolina Panthers, stating that the Carolina Panthers' position that they are entitled to claim a "dollar-for-dollar" offset against workers' compensation awards paid

2

to players Charles Smith, Dusty Renfro, Michael Swift and Jason Peter violated the express language of Paragraph 10 of the NFL Player Contract.

6.    On September 14, 2005, the NFLPA filed an amended grievance to include NFL player Marlon Kerner as an additional grievant in the grievance against the Buffalo Bills and the New York Jets commenced on May 17, 2005.

7.    The NFLPA's grievance against the Carolina Panthers was consolidated with its grievance against the Buffalo Bills and the New York Jets for purposes of arbitration.

8.    An arbitration hearing was held on January 10, 2006 in New York, New York before Shyam Das ("Arbitrator Das"), an Arbitrator mutually selected by the NFPLA and NFL Management Council pursuant to the CBA.

9.    On February 14, 2007, Arbitrator Das issued a written Opinion and Award ("Award"). A true and copy of the Award is attached hereto as Exhibit C.

10.    As part of the parties' negotiation of a new CBA in the summer of 2006, the parties agreed that the final award would not be delivered to any of the parties until July 2007. Pursuant to the parties' agreement, on March 13, 2007, Arbitrator Das sent two copies of the Award enclosed in a sealed brown envelope to Special Master Stephen Burbank ("Special Master Burbank"), who was to unseal the Award and provide copies of the Award to both the NFLPA and the NFL Management Council on July 1, 2007. A true and correct copy of a letter from Arbitrator Das to Special Master Burbank dated March 13, 2007 is attached hereto as Exhibit D.

11.    Due to scheduling considerations, and with the agreement of the parties, on June 6, 2007, Special Master Burbank unsealed the Award and delivered the Award to both the NFLPA and the NFL Management Council.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on June 17, 2008 in New York, New York.

Adam J. Kaiser

4

# EXHIBIT A



# NFL COLLECTIVE BARGAINING AGREEMENT 2006-2012

COLLECTIVE BARGAINING AGREEMENT
BETWEEN
THE NFL MANAGEMENT COUNCIL
AND
THE NFL PLAYERS ASSOCIATION
March 8, 2006



**NFL PLAYERS**
A S S O C I A T I O N

# ARTICLE X
# INJURY GRIEVANCE

*Section 1. Definition:* An "injury grievance" is a claim or complaint that, at the time a player's NFL Player Contract was terminated by a Club, the player was physically unable to perform the services required of him by that contract because of an injury incurred in the performance of his services under that contract. All time limitations in this Article may be extended by mutual agreement of the parties.

*Section 2. Filing:* Any player and/or the NFLPA must present an injury grievance in writing to a Club, with a copy to the Management Council, within twenty-five days from the date it became known or should have become known to the player that his contract had been terminated. The grievance will set forth the approximate date of the alleged injury and its general nature. If a grievance is filed by a player without the involvement of the NFLPA, the Management Council will promptly send copies of the grievance and the answer to the NFLPA.

*Section 3. Answer:* The Club to which an injury grievance has been presented will answer in writing within seven days. If the answer contains a denial of the claim, the general grounds for such denial will be set forth. The answer may raise any special defense, including but not limited to the following:

(a)    That the player did not pass the physical examination administered by the Club physician at the beginning of the pre-season training camp for the year in question. This defense will not be available if the player participated in any team drills following his physical examination or in any pre-season or regular season game; provided, however, that the Club physician may require the player to undergo certain exercises or activities, not team drills, to determine whether the player will pass the physical examination;

(b)    That the player failed to make full and complete disclosure of this known physical or mental condition when questioned during the physical examination;

(c)    That the player's injury occurred prior to the physical examination and the player knowingly executed a waiver or release prior to the physical examination or his commencement of practice for the season in question which specifically pertained to such prior injury;

(d)    That the player's injury arose solely from a non-football-related cause subsequent to the physical examination;

(e)    That subsequent to the physical examination the player suffered no new football-related injury;

(f)    That subsequent to the physical examination the player suffered no football-related aggravation of a prior injury reducing his physical ca-

pacity below the level existing at the time of his physical examination as contemporaneously recorded by the Club physician.

*Section 4. Neutral Physician:* The player must present himself for examination by a neutral physician in the Club city or the Club city closest to the player's residence within twenty days from the date of the grievance. This time period may be extended by mutual consent if the neutral physician is not available. Neither Club nor player may submit any medical records to the neutral physician, nor may the Club physician or player's physician communicate with the neutral physician. The player will notify the Club of the identity of the neutral physician by whom he is to be examined as soon as possible subsequent to a selection by the player. The neutral physician will not become the treating physician nor will the neutral physician examination involve more than one office visit without the prior approval of both the NFLPA and Management Council. The neutral physician may review any objective medical tests which all parties mutually agree to provide. The neutral physician is further authorized to perform any necessary diagnostic tests after consultation with the parties. The neutral physician is required to submit to the parties a detailed typewritten medical report of his examination. In order to facilitate settlement of grievances, the parties periodically will consult with neutral physicians by telephone conference call to obtain preliminary opinions as to the length of time, if any, after their examinations before players would be physically able to perform contract services. The NFLPA will use its best efforts to make the neutral physicians in each Club city equally available to the players who file injury grievances.

*Section 5. Neutral Physician List:* The NFLPA and the Management Council will maintain a jointly approved list of neutral physicians, including at least two orthopedic physicians in each city in which a Club is located. This list will be subject to review and modification between February 1 and April 15 of each year, at which time either party may eliminate any two neutral physicians from the list by written notice to the other party. When vacancies occur, the NFLPA and the Management Council will each submit a list of three orthopedic physicians to the other party within thirty days for each NFL city where a vacancy exists. If the parties are unable to agree on a replacement within ten days, they will select a neutral physician for each city by alternately striking names. The party to strike a name first will be determined by a flip of a coin. If either party fails to cooperate in the striking process the other party may select one of the nominees on its list, and the other party will be bound by such selection. The next vacancy occurring will be filled in similar fashion with the party who initially struck first then striking second. The parties will alternate striking first for future vacancies occurring thereafter during the term of this Agreement.

Article X, Injury Grievance

**Section 6. Appeal:** A grievance may be appealed to an arbitrator by filing of written notice of appeal with the chairman of the arbitration panel within thirty days from the date of receipt of the neutral physician's written report.

**Section 7. Arbitration Panel:** There will be a panel of five arbitrators, whose appointment must be accepted in writing by the NFLPA and the Management Council. The parties shall designate the Chairman of the panel. In the event of a vacancy in the position of the Chairman of the panel, the senior arbitrator in terms of affiliation with this Agreement will succeed to the position of Chairman of the panel, and the resultant vacancy on the panel will be filled according to the procedures of this Section. Either party to this Agreement may discharge a member of the arbitration panel by serving written notice upon the arbitrator and the other party to this Agreement between December 1 and 10 of each year, but at no time shall such discharges result in no arbitrators remaining on the panel. If either party discharges an arbitrator, the other party shall have two business days to discharge any other arbitrator. Any vacancies occurring on the arbitration panel will be filled as follows: If the parties are unable to agree to a new arbitrator within thirty days of the occurrence of the vacancy, the Chairman of the panel shall submit a list of ten qualified and experienced arbitrators to the NFLPA and the Management Council. Within fourteen days of the receipt of the list, the NFLPA and the Management Council shall select one arbitrator from the list by alternately striking names until only one remains, with a coin flip determining the first strike. The next vacancy occurring will be filled in similar fashion, with the party who initially struck first, then striking second. The parties will alternate striking first for future vacancies occurring thereafter during the term of this Agreement. If either party fails to cooperate in the striking process, the other party may select one of the nominees on the list and the other party will be bound by such selection.

**Section 8. Hearing:** Each arbitrator shall designate a minimum of twelve hearing dates per year, exclusive of the period July 15 through September 10, for use by the parties to this Agreement. Upon being appointed, each arbitrator will, after consultation with the Chairman, provide to the NFLPA and the Management Council specified hearing dates for each of the ensuing six months, which process will be repeated on a semiannual basis thereafter. The parties will notify each arbitrator thirty days in advance of which dates the following month are going to be used by the parties. The designated arbitrator will set the hearing on his or her next reserved date in the Club city, unless the parties agree otherwise. If a grievance is set for hearing and the hearing date is then postponed by a party within thirty days of the hearing date, the postponement fee of the arbitrator will be borne by the postponing party unless the arbitrator determines that the postponement was for good cause. Should good cause be found, the parties will share any postponement costs equally. If the arbitrator in question cannot

Article X, Injury Grievance

reschedule the hearing within thirty days of the postponed date, the case may be reassigned by the Chairman to another panel member who has a hearing date available within the thirty-day period. At the hearing, the parties to the grievance and the NFLPA and Management Council will have the right to present, by testimony or otherwise, any evidence relevant to the grievance. The NFLPA and the Management Council have the right to attend all grievance hearings. All hearings shall be transcribed.

If a witness is unable to attend the hearing, the party offering the testimony shall inform the other party of the identity and unavailability of the witness to attend the hearing. At the hearing or within fourteen days thereafter, the party offering the testimony of the unavailable witness must offer the other party two possible dates within the next forty-five days to take the witness' testimony. The other party shall have the opportunity to choose the date. The record should be closed sixty days after the hearing date unless mutually extended notwithstanding any party's failure to present post-hearing testimony within the above-mentioned time period. If a witness is unavailable to come to the hearing, the witness' testimony may be taken by telephone conference call if the parties agree. In cases where the amount claimed is less than $25,000, the parties may agree to hold the hearing by telephone conference call.

Post-hearing briefs must be submitted to the arbitrator postmarked no later than sixty-five days after receipt of the last transcript. The arbitrator will issue a written decision within thirty days of the submission of briefs but shall not consider briefs filed by either party more than sixty-five days after receipt of the last transcript, unless the parties agree otherwise. The arbitrator's decision will be final and binding, provided, however, that no arbitrator will have the authority to add to, subtract from, or alter in any way any provision of this Agreement or any other applicable document. In the event the arbitrator finds liability on the part of the Club, he shall award interest beginning one year from the date of the last regular season game of the season of injury. The interest shall be calculated at the one-year Treasury Note rate published in The Wall Street Journal as of February 1 (or the next date published) of each year, and such rate shall apply to any interest awarded during each such subsequent twelve-month period.

**Section 9. Miscellaneous:** The arbitrator will consider the neutral physician's findings conclusive with regard to the physical condition of the player and the extent of an injury at the time of his examination by the neutral physician. The arbitrator will decide the dispute in light of this finding and such other issues or defenses which may have been properly submitted to him. The Club or the Management Council must advise the grievant and the NFLPA in writing no later than seven days before the hearing of any special defense to be raised at the hearing. The arbitrator may award the player such payments for medical expenses incurred or which will be incurred in connection with an injury.

Article X, Injury Grievance

**Section 10. Expenses:** Expenses charged by a neutral physician will be shared equally by the Club and the player. All travel expenses incurred by the player in connection with his examination by a neutral physician of his choice will be borne by the player. The parties will share equally in the expenses of any arbitration engaged in pursuant to this Article; provided, however, the respective parties will bear the expenses of attendance of their own witnesses. Notwithstanding the above, if the hearing is held in the Club city and if the arbitrator finds liability on the part of the Club, the arbitrator shall award the player reasonable expenses incurred in traveling to and from his residence to the Club city and one night's lodging.

**Section 11. Pension Credit:** Any player who receives payment for three or more regular season games during any year as a result of filing an injury grievance or settlement of a potential injury grievance will be credited with one year of Credited Service for the year in which injured under the Bert Bell/Pete Rozelle NFL Player Retirement Plan as determined by the Retirement Board.

**Section 12. Payment:** If an award is made by the arbitrator, payment will be made within thirty days of the receipt of the award to the player or jointly to the player and the NFLPA, provided the player has given written authorization for such joint payment. The time limit for payment may be extended by mutual consent of the parties or by a finding of good cause for the extension by the arbitrator. Where payment is unduly delayed beyond thirty days, interest will be assessed against the Club from the date of the decision. Interest shall be calculated at double the one-year Treasury Note rate published in *The Wall Street Journal* as of February 1 (or next date published) of each year, and such rate shall apply to the interest awarded during each such subsequent twelve-month period in lieu of continuation of the pre-award interest. The arbitrator shall retain jurisdiction of the case for the purpose of awarding post-hearing interest pursuant to this Section.

**Section 13. Presumption of Fitness:** If the player passes the physical examination of the Club prior to the pre-season training camp for the year in question, having made full and complete disclosure of his known physical and mental condition when questioned by the Club physician during the physical examination, it will be presumed that such player was physically fit to play football on the date of such examination.

**Section 14. Playoff Money:** If the arbitrator finds that an injured player remained physically unable to perform the services required of him by his contract during the NFL postseason playoffs and if the Club in question participated in the playoffs that season, the player will be entitled to and the arbitrator shall award, such playoff money as though he had been on the Injured Reserve list at the time of the playoff games in question, should

32

Article X, Injury Grievance

he otherwise qualify for such pay pursuant to Article XLII (Postseason Pay).

**Section 15. Information Exchange:** The NFLPA and the Management Council must confer on a regular basis concerning the status of pending injury grievances and the attribution of any injury grievance exposure to Team Salary under Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary). Any communications pursuant to this Section are inadmissible in any grievance hearing.

**Section 16. Discovery:** No later than ten days prior to the hearing, each party will submit to the other copies of all documents, reports and records relevant to the injury grievance hearing. Failure to submit such documents, reports and records no later than ten days prior to the hearing will preclude the non-complying party from submitting such documents, reports and records into evidence at the hearing, but the other party will have the opportunity to examine such documents, reports and records at the hearing and to introduce those it so desires into evidence, except that relevant documents submitted to the opposing party less than ten days before the hearing shall be admissible provided the offering party and the custodian(s) of the documents made good faith effort to obtain (or discover the existence of) such documents or that the documents' relevance was not discovered until the hearing.

33

# EXHIBIT B

Appendix C

# APPENDIX C
## NFL PLAYER CONTRACT

THIS CONTRACT is between _____, hereinafter "Player," and a _____ (limited partnership) (partnership), hereinafter "Club," operating under the name of the _____ corporation as a member of the National Football League, hereinafter "League." In consideration of the promises made by each to the other, Player and Club agree as follows:

1.  TERM. This contract covers _____ football season(s), and will begin on the date of execution or March 1, _____, whichever is later, and end on February 28 or 29, _____, unless extended, terminated, or renewed as specified elsewhere in this contract.

2.  EMPLOYMENT AND SERVICES. Club employs Player as a skilled football player. Player accepts such employment. He agrees to give his best efforts and loyalty to the Club, and to conduct himself on and off the field with appropriate recognition of the fact that the success of professional football depends largely on public respect for and approval of those associated with the game. Player will report promptly for and participate fully in Club's official mandatory minicamp(s), official pre-season training camp, all Club meetings and practice sessions, and all pre-season, regular season and postseason football games scheduled for or by Club. If invited, Player will practice for and play in any all-star football game sponsored by the League. Player will not participate in any football game not sponsored by the League unless the game is first approved by the League.

3.  OTHER ACTIVITIES. Without prior written consent of the Club, Player will not play football or engage in activities related to football otherwise than for Club or engage in any activity other than football which may involve a significant risk of personal injury. Player represents that he has special, exceptional and unique knowledge, skill, ability, and experience as a football player, the loss of which cannot be estimated with any certainty and cannot be fairly or adequately compensated by damages. Player therefore agrees that Club will have the right, in addition to any other right which Club may possess, to enjoin Player by appropriate proceedings from playing football or engaging in football-related activities other than for Club or from engaging in any activity other than football which may involve a significant risk of personal injury.

4.  PUBLICITY AND NFLPA GROUP LICENSING PROGRAM.
(a) Player grants to Club and the League, separately and together, the authority to use his name and picture for publicity and the promotion of NFL Football, the League or any of its member clubs in newspapers, magazines, motion pictures, game programs and roster manuals, broadcasts and telecasts, and all other publicity and advertising media, provided such publicity and promotion does not constitute an endorsement by Player of a commercial product. Player will cooperate with the news media, and will participate upon request in reasonable activities to promote the Club and the League. Player and National Football League Players Association, hereinafter "NFLPA," will not contest the rights of the League and its member clubs to telecast, broadcast, or otherwise transmit NFL Football or the right of NFL Films to produce, sell, market, or distribute football game film footage, except insofar as such broadcast, telecast, or transmission of footage is used in any commercially marketable game or interactive use. The League and its member clubs, and Player and the NFLPA, reserve their respective rights as to the use of such broadcasts, telecasts or transmissions of footage in such games or interactive uses, which shall be unaffected by this subparagraph.

(b) Player hereby assigns to the NFLPA and its licensing affiliates, if any, the exclusive right to use and to grant to persons, firms, or corporations (collectively "licensees") the right to use his name, signature facsimile, voice, picture, photograph, likeness, and/or biographical information (collectively "image") in group licensing programs. Group licensing programs are defined as those licensing programs in which a licensee utilizes a total of six or more NFL player images on or in conjunction with products (including, but not limited to, trading cards, clothing, videogames, computer games, collectibles, internet sites, fantasy games, etc.) that are sold at retail or used as promotional or premium items. Player retains the right to grant permission to a licensee to utilize his image if that licensee is not concurrently utilizing the images of five or more other NFL players on products that are sold at retail or are used as promotional or premium items. If Player's inclusion in a particular NFLPA program is precluded by an individual exclusive endorsement agreement, and Player provides the NFLPA with timely written notice of that preclusion, the NFLPA will exclude Player from that particular program. In consideration for this assignment of rights, the NFLPA will use the revenues it receives from group licensing programs to support the objectives as set forth in the Bylaws of the NFLPA. The NFLPA will use its best efforts to promote the use of NFL player images in group licensing programs, to provide group licensing opportunities to all NFL players, and to ensure that no entity utilizes the group licensing rights granted to the NFLPA without first obtaining a license from the NFLPA. This subparagraph (b) shall be construed under Virginia law without reference to conflicts of law principles. The assignment in this paragraph shall expire on December 31 of the later of (a) the third year following the execution of this contract, or (b) the year in which this contract expires. Neither Club

nor the League is a party to the terms of this paragraph, which is included herein solely for the administrative convenience and benefit of Player and the NFLPA. The terms of this subparagraph apply unless, at the time of execution of this contract, Player indicates by striking out this subparagraph (b) and marking his initials adjacent to the stricken language his intention to not participate in the NFLPA Group Licensing Program. Nothing in this subparagraph shall be construed to supersede or any way broaden, expand, detract from, or otherwise alter in any way whatsoever, the rights of NFL Properties, Inc. as permitted under Article V (Union Security), Section 4 of the 1993 Collective Bargaining Agreement ("CBA").

5. COMPENSATION. For performance of Player's services and all other promises of Player, Club will pay Player a yearly salary as follows:

$_____ for the 20____ season;

$_____ for the 20____ season;

$_____ for the 20____ season;

$_____ for the 20____ season;

$_____ for the 20____ season.

In addition, Club will pay Player such earned performance bonuses as may be called for in this contract; Player's necessary traveling expenses from his residence to training camp; Player's reasonable board and lodging expenses during pre-season training and in connection with playing pre-season, regular season, and postseason football games outside Club's home city; Player's necessary traveling expenses to and from pre-season, regular season, and postseason football games outside Club's home city; Player's necessary traveling expenses to his residence if this contract is terminated by Club; and such additional compensation, benefits and reimbursement of expenses as may be called for in any collective bargaining agreement in existence during the term of this contract. (For purposes of this contract, a collective bargaining agreement will be deemed to be "in existence" during its stated term or during any period for which the parties to that agreement agree to extend it.)

6. PAYMENT. Unless this contract or any collective bargaining agreement in existence during the term of this contract specifically provides otherwise, Player will be paid 100% of his yearly salary under this contract in equal weekly or biweekly installments over the course of the applicable regular season period, commencing with the first regular season game played by Club in each season. Unless this contract specifically provides otherwise, if this contract is executed or Player is activated after the beginning of the regular season, the yearly salary payable to Player will be reduced proportionately and Player will be paid the weekly or biweekly por-

tions of his yearly salary becoming due and payable after he is activated. Unless this contract specifically provides otherwise, if this contract is terminated after the beginning of the regular season, the yearly salary payable to Player will be reduced proportionately and Player will be paid the weekly or bi-weekly portions of his yearly salary having become due and payable up to the time of termination.

7. DEDUCTIONS. Any advance made to Player will be repaid to Club, and any properly levied Club fine or Commissioner fine against Player will be paid, in cash on demand or by means of deductions from payments coming due to the Player under this contract, the amount of such deductions to be determined by Club unless this contract or any collective bargaining agreement in existence during the term of this contract specifically provides otherwise.

8. PHYSICAL CONDITION. Player represents to Club that he is and will maintain himself in excellent physical condition. Player will undergo a complete physical examination by the Club physician upon Club request, during which physical examination Player agrees to make full and complete disclosure of any physical or mental condition known to him which might impair his performance under this contract and to respond fully and in good faith when questioned by the Club physician about such condition. If Player fails to establish or maintain his excellent physical condition to the satisfaction of the Club physician, or make the required full and complete disclosure and good faith responses to the Club physician, then Club may terminate this contract.

9. INJURY. Unless this contract specifically provides otherwise, if Player is injured in the performance of his services under this contract and promptly reports such injury to the Club physician or trainer, then Player will receive such medical and hospital care during the term of this contract as the Club physician may deem necessary, and will continue to receive his yearly salary for so long, during the season of injury only and for no subsequent period covered by this contract, as Player is physically unable to perform the services required of him by this contract because of such injury. If Player's injury in the performance of his services under this contract results in his death, the unpaid balance of his yearly salary for the season of injury will be paid to his stated beneficiary, or in the absence of a stated beneficiary, to his estate.

10. WORKERS' COMPENSATION. Any compensation paid to Player under this contract or under any collective bargaining agreement in existence during the term of this contract for a period during which he is entitled to workers' compensation benefits by reason of temporary total, permanent total, temporary partial, or permanent partial disability will be

Appendix C

deemed an advance payment of workers' compensation benefits due Player, and Club will be entitled to be reimbursed the amount of such payment out of any award of workers' compensation.

11. SKILL, PERFORMANCE AND CONDUCT. Player understands that he is competing with other players for a position on Club's roster within the applicable player limits. If at any time, in the sole judgment of Club, Player's skill or performance has been unsatisfactory as compared with that of other players competing for positions on Club's roster, or if Player has engaged in personal conduct reasonably judged by Club to adversely affect or reflect on Club, then Club may terminate this contract. In addition, during the period any salary cap is legally in effect, this contract may be terminated if, in Club's opinion, Player is anticipated to make less of a contribution to Club's ability to compete on the playing field than another player or players whom Club intends to sign or attempts to sign, or another player or players who is or are already on Club's roster, and for whom Club needs room.

12. TERMINATION. The rights of termination set forth in this contract will be in addition to any other rights of termination allowed either party by law. Termination will be effective upon the giving of written notice, except that Player's death, other than as a result of injury incurred in the performance of his services under this contract, will automatically terminate this contract. If this contract is terminated by Club and either Player or Club so requests, Player will promptly undergo a complete physical examination by the Club physician.

13. INJURY GRIEVANCE. Unless a collective bargaining agreement in existence at the time of termination of this contract by Club provides otherwise, the following injury grievance procedure will apply: If Player believes that at the time of termination of this contract by Club he was physically unable to perform the services required of him by this contract because of an injury incurred in the performance of his services under this contract, Player may, within sixty days after examination by the Club physician, submit at his own expense to examination by a physician of his choice. If the opinion of Player's physician with respect to his physical ability to perform the services required of him by this contract is contrary to that of the Club's physician, the dispute will be submitted within a reasonable time to final and binding arbitration by an arbitrator selected by Club and Player or, if they are unable to agree, one selected in accordance with the procedures of the American Arbitration Association on application by either party.

14. RULES. Player will comply with and be bound by all reasonable Club rules and regulations in effect during the term of this contract which

Appendix C

are not inconsistent with the provisions of this contract or of any collective bargaining agreement in existence during the term of this contract. Player's attention is also called to the fact that the League functions with certain rules and procedures expressive of its operation as a joint venture among its member clubs and that these rules and practices may affect Player's relationship to the League and its member clubs independently of the provisions of this contract.

15. INTEGRITY OF GAME. Player recognizes the detriment to the League and professional football that would result from impairment of public confidence in the honest and orderly conduct of NFL games or the integrity and good character of NFL players. Player therefore acknowledges his awareness that if he accepts a bribe or agrees to throw or fix an NFL game; fails to promptly report a bribe offer or an attempt to throw or fix an NFL game; bets on an NFL game; knowingly associates with gamblers or gambling activity; uses or provides other players with stimulants or other drugs for the purpose of attempting to enhance on-field performance; or is guilty of any other form of conduct reasonably judged by the League Commissioner to be detrimental to the League or professional football, the Commissioner will have the right, but only after giving Player the opportunity for a hearing at which he may be represented by counsel of his choice, to fine Player in a reasonable amount; to suspend Player for a period certain or indefinitely; and/or to terminate this contract.

16. EXTENSION. Unless this contract specifically provides otherwise, if Player becomes a member of the Armed Forces of the United States or any other country, or retires from professional football as an active player, or otherwise fails or refuses to perform his services under this contract, then this contract will be tolled between the date of Player's induction into the Armed Forces, or his retirement, or his failure or refusal to perform, and the later date of his return to professional football. During the period this contract is tolled, Player will not be entitled to any compensation or benefits. On Player's return to professional football, the term of this contract will be extended for a period equal to the number of seasons (to the nearest multiple of one) remaining at the time the contract was tolled. The right of renewal, if any, contained in this contract will remain in effect until the end of any such extended term.

17. ASSIGNMENT. Unless this contract specifically provides otherwise, Club may assign this contract and Player's services under this contract to any successor to Club's franchise or to any other Club in the League. Player will report to the assignee Club promptly upon being informed of the assignment of this contract and will faithfully perform his services under this contract. The assignee club will pay Player's necessary traveling expenses in reporting to it and will faithfully perform this contract with Player.

Appendix C

**18.  FILING.** This contract will be valid and binding upon Player and Club immediately upon execution. A copy of this contract, including any attachment to it, will be filed by Club with the League Commissioner within ten days after execution. The Commissioner will have the right to disapprove this contract on reasonable grounds, including but not limited to an attempt by the parties to abridge or impair the rights of any other club, uncertainty or incompleteness in expression of the parties' respective rights and obligations, or conflict between the terms of this contract and any collective bargaining agreement then in existence. Approval will be automatic unless, within ten days after receipt of this contract in his office, the Commissioner notifies the parties either of disapproval or of extension of this ten-day period for purposes of investigation or clarification pending his decision. On the receipt of notice of disapproval and termination, both parties will be relieved of their respective rights and obligations under this contract.

**19.  DISPUTES.** During the term of any collective bargaining agreement, any dispute between Player and Club involving the interpretation or application of any provision of this contract will be submitted to final and binding arbitration in accordance with the procedure called for in any collective bargaining agreement in existence at the time the event giving rise to any such dispute occurs.

**20.  NOTICE.** Any notice, request, approval or consent under this contract will be sufficiently given if in writing and delivered in person or mailed (certified or first class) by one party to the other at the address set forth in this contract or to such other address as the recipient may subsequently have furnished in writing to the sender.

**21.  OTHER AGREEMENTS.** This contract, including any attachment to it, sets forth the entire agreement between Player and Club and cannot be modified or supplemented orally. Player and Club represent that no other agreement, oral or written, except as attached to or specifically incorporated in this contract, exists between them. The provisions of this contract will govern the relationship between Player and Club unless there are conflicting provisions in any collective bargaining agreement in existence during the term of this contract, in which case the provisions of the collective bargaining agreement will take precedence over conflicting provisions of this contract relating to the rights or obligations of either party.

**22.  LAW.** This contract is made under and shall be governed by the laws of the State of _____

**23.  WAIVER AND RELEASE.** Player waives and releases any claims that he may have arising out of, related to, or asserted in the lawsuit entitled White v. National Football League, including, but not limited to, any such claim regarding past NFL Rules, the College Draft, Plan B, the first refusal/compensation system, the NFL Player Contract, pre-season compensation, or any other term or condition of employment, except any claims asserted in Brown v. Pro Football, Inc. This waiver and release also extends to any conduct engaged in pursuant to the Stipulation and Settlement Agreement in White ("Settlement Agreement") during the express term of that Settlement Agreement or any portion thereof. This waiver and release shall not limit any rights Player may have to performance by the Club under this Contract or Player's rights as a member of the White class to object to the Settlement Agreement during its review by the court in Minnesota. This waiver and release is subject to Article XIV (NFL Player Contract), Section 3(c) of the CBA.

**24.  OTHER PROVISIONS.**

(a)  Each of the undersigned hereby confirms that (i) this contract, renegotiation, extension or amendment sets forth all components of the player's remuneration for playing professional football (whether such compensation is being furnished directly by the Club or by a related or affiliated entity); and (ii) there are not undisclosed agreements of any kind, whether express or implied, oral or written, and there are no promises, undertakings, representations, commitments, inducements, assurances of intent, or understandings of any kind that have not been disclosed to the NFL involving consideration of any kind to be paid, furnished or made available to Player or any entity or person owned or controlled by, affiliated with, or related to Player, either during the term of this contract or thereafter.

(b)  Each of the undersigned further confirms that, except insofar as any of the undersigned may describe in an addendum to this contract, to the best of their knowledge, no conduct in violation of the Anti-Collusion rules of the Settlement Agreement took place with respect to this contract. Each of the undersigned further confirms that nothing in this contract is designed or intended to defeat or circumvent any provisions of the Settlement Agreement, including but not limited to the Rookie Pool and Salary Cap provisions; however, any conduct permitted by the CBA and/or the Settlement Agreement shall not be considered a violation of this confirmation.

(c)  The Club further confirms that any information regarding the negotiation of this contract that it provided to the Neutral Verifier was, at the time the information was provided, true and correct in all material respects.

Appendix C

Appendix C

25. SPECIAL PROVISIONS.

THIS CONTRACT is executed in six copies. Player acknowledges that before signing this contract he was given the opportunity to seek advice from or be represented by persons of his own selection.

PLAYER _____

Home Address _____

Telephone Number _____

Date _____

PLAYER'S CERTIFIED AGENT

Address _____

Telephone Number _____

Date _____

CLUB _____

By _____

Club Address _____

Date _____

Copy Distribution:    White-League Office      Yellow-Player
                      Green-Member Club        Blue-Management Council
                      Gold-NFLPA               Pink-Player Agent

256

# EXHIBIT C

SHYAM DAS, ARBITRATOR

In the Matter of Arbitration
Between

- - - - - - - - - - - - - - - -)
THE NATIONAL FOOTBALL LEAGUE        )
PLAYERS ASSOCIATION On Behalf       )
of Steve Harvey, David Alexander    )
and Marlon Kerner                   )
                                    )        ARBITRATOR'S OPINION
          and                       )             AND AWARD
                                    )
THE NATIONAL FOOTBALL LEAGUE        )
MANAGEMENT COUNCIL On Behalf        )
of THE BUFFALO BILLS and            )
THE NEW YORK JETS                   )
- - - - - - - - - - - - - - - -)
                                             February 14, 2007


- - - - - - - - - - - - - - - -)
THE NATIONAL FOOTBALL LEAGUE        )
PLAYERS ASSOCIATION On Behalf       )
of Charles Smith, Dusty Renfro,     )
Michael Swift and Jason Peter       )
                                    )
          and                       )
                                    )
THE NATIONAL FOOTBALL LEAGUE        )
MANAGEMENT COUNCIL On Behalf        )
THE CAROLINA PANTHERS               )
- - - - - - - - - - - - - - - -)


Appearances


For the NFL Players Association:

          Richard A. Berthelsen, Esq.
          Jeffrey L. Kessler, Esq.
          Adam J. Kaiser, Esq.
          Kristin A. Meister, Esq.

2                          NFLPA/NFL
                           WC Offset


For the NFL Management Council:

                T. David Gardi, Esq.
                Daniel L. Nash, Esq.
                Brook F. Gardiner, Esq.
                Sylvia A. Krainin, Esq.

BACKGROUND

NFLPA/NFL
WC Offset

On May 17, 2005, the NFLPA filed a grievance stating as follows:

Pursuant to Article IX of the NFL 2002-2008 Collective Bargaining Agreement ("CBA"), the NFLPA hereby files a non-injury grievance against the Buffalo Bills, New York Jets (collectively, the "New York Clubs") and the NFL Management Council.

It is our understanding that following the New York State Workers' Compensation Board's decisions in *Steve Harvey*, WCB Case #89516968 (April 4, 2005) and *David F Alexander*, WCB Case #89814852 (April 4, 2005), the Buffalo Bills and the New York Jets are now claiming an offset against money paid to NFL Players Steve Harvey and David Alexander, respectively, for the entire amount of the workers' compensation benefits awarded to those players (*i.e.*, a "dollar for dollar" offset) in the above cited cases.

The New York Clubs' conduct in seeking this dollar for dollar offset violates the express language of Paragraph 10 of the NFL Player Contract, which permits Clubs to take only a limited offset for the amount of workers' compensation benefits due and payable during the same period of time in which a player is deemed to be entitled to his salary under his contract (*i.e.*, a "time" offset). *See* CBA, App. C (NFL Player Contract) at ¶10. The New York Clubs' conduct likewise violates various NFL arbitration decisions holding that Paragraph 10 permits Clubs to take only a "time" offset, as opposed to a "dollar for dollar" offset. *See, e.g., Kyle Freeman v. Los Angeles Raiders* (Arbitrator Kagel, Dec. 28, 1994).

To the extent that New York state workers'
compensation caselaw provides for a greater
offset than is permitted by Paragraph 10,
and is therefore inconsistent with the terms
of the CBA as interpreted in arbitration,
such state law is preempted pursuant to
federal labor law. *See, e.g., Tampa Bay
Area NFL Football, Inc. v. Jarvis*, 668 So.
2d 217, 219 (Fla. Dist. Ct. App. 1996)
(applying the "time" offset provided for in
Paragraph 10 of the NFL Player Contract
instead of the "dollar for dollar" offset
provided for by Florida statutory law).

The NFLPA therefore seeks a ruling from the
Arbitrator that the New York Clubs must
cease and desist from any further attempts
to claim offsets for the entire amount of
workers' compensation benefits awarded to
NFL players (*i.e.,* a "dollar for dollar"
offset) instead of the limited "time" offset
permitted by Paragraph 10 of the NFL Player
Contract. The NFLPA further seeks
declarations that (1) Paragraph 10 of the
NFL Player Contract provides for a "time"
offset and not a "dollar for dollar" offset;
(2) the "time" offset in Paragraph 10
applies regardless of whether New York state
law provides for a greater offset; and (3)
the New York Clubs may not make any further
attempts to claim a "dollar for dollar"
offset against workers' compensation awards.
Finally, the NFLPA seeks any additional
remedy that the Arbitrator shall deem just
and equitable.
                    (Underlining in original.)


On September 14, 2005, the NFLPA filed a separate
grievance against the Carolina Panthers, which has been

3                                          NFLPA/NFL
                                           WC Offset

consolidated with the New York grievance for purposes of
arbitration.  The Panthers grievance states as follows:

> Pursuant to Article IX of the NFL 2002-2008
> Collective Bargaining Agreement ("CBA"), the
> NFLPA and players Charles Smith, Dusty
> Renfro, Michael Swift and Jason Peters [sic]
> hereby file a non-injury grievance against
> the Carolina Panthers pursuant to Article IX
> of the 1993 CBA, as amended.
>
> It has come to the NFLPA's attention that
> the Carolina Panthers are taking the
> position that they are entitled to claim a
> "dollar-for-dollar" offset against workers'
> compensation awards paid to their players.
> For example, the Panthers have taken the
> position within the past month that they are
> entitled to a "dollar-for-dollar" offset
> against any workers' compensation award paid
> to Jason Peters [sic].  The club and/or its
> insurer has also claimed to the North
> Carolina Court of Appeals that it is
> entitled to a dollar-for-dollar offset
> against the claims of Charles Smith, Dusty
> Renfro and Michael Swift....  The NFLPA has
> challenged a similar position taken by the
> Buffalo Bills and New York Jets in a
> grievance previously filed on May 17, 2005,
> and believes that this case can be
> consolidated with the New York case for
> purposes of final disposition under Article
> IX.
>
> In this grievance, the NFLPA requests the
> same relief from the Panthers that it is
> currently seeking from the Bills, Jets, and
> NFL Management Council in the New York
> case....

4                          NFLPA/NFL
                           WC Offset

On September 14, 2005, the NFLPA also filed an amended
grievance to include NFL player Marlon Kerner as an additional
grievant in the May 17, 2005, New York grievance, on the basis
that: "the Bills have claimed a 'dollar-for-dollar' offset
against the entire amount of the workers compensation benefits
awarded to Mr. Kerner, in violation of Paragraph 10 of the NFL
Player contract."

The consolidated grievances were heard in arbitration
on January 10, 2006.  The parties filed pre-hearing briefs.

*       *       *

Players who are injured and unable to play may be
entitled to a number of benefits under the Collective Bargaining
Agreement (CBA), including salary continuance, as provided in
Paragraph 9 of the NFL Player Contract, and injury protection
benefit, as provided in Article XII of the CBA.

Since 1977, Paragraph 10 of the NFL Player Contract,
which is an integral part of the CBA, has provided:

> 10.  WORKERS' COMPENSATION.  Any
> compensation paid to Player under this
> contract or under any collective bargaining
> agreement in existence during the term of
> this contract for a period during which he
> is entitled to workers' compensation
> benefits by reason of temporary total,
> permanent total, temporary partial, or
> permanent partial disability will be deemed
> an advance payment of workers' compensation

benefits due Player, and Club will be
entitled to be reimbursed the amount of such
payment out of any award of workers'
compensation.

One of the issues presented in Freeman v. Los Angeles
Raiders (Kagel 1994) -- a case cited by the NFLPA in the present
grievances -- was the extent to which the Raiders were entitled
to a workers' compensation offset against injury protection
payments that Kyle Freeman was found to be eligible to receive
in that decision.  The Raiders contended they were entitled to a
complete "dollar-for-dollar" offset, regardless of the period
for which the workers' compensation payments were received.
Freeman argued the Club was only entitled to a limited "time"
offset.  In addressing this issue, Arbitrator Kagel stated:

> In view of the decision to award Freeman the
> monies due him under the Injury Protection
> provision of the Agreement, the Club
> contends that it is entitled to an offset
> for Workers' Compensation monies which have
> been and may be received by Freeman.
>
> Freeman contends that the offset granted
> under paragraph 10 should be limited
> strictly to the amount of Workers'
> Compensation benefits due and payable to him
> during the same period in which he was
> deemed entitled to his salary and/or his
> Injury Protection benefit.
>
> Paragraph 10 is designed to avoid "double
> dipping" by a Player in a case where the
> Player is receiving a salary or injury
> protection compensation and is also
> receiving Workers' Compensation by providing
> that the Club can offset Workers'

Compensation payments against such salary or
injury protection payments.

The "period" during which such offsets can
be made by the Club is the period of salary
payments or the period related to the injury
protection period, in Freeman's case the
1993 regular season.

The decision in <u>Freeman</u> on this issue stated:  "The Workmen's
Compensation for Freeman shall be an offset on a time basis for
the 1993 regular season...."

Article LIV (Workers' Compensation) of the CBA
provides, in relevant part:

*Section 1*. Benefits:  In any state where
workers' compensation coverage is not
compulsory, a Club will either voluntarily
obtain coverage under the compensation laws
of that state or otherwise guarantee
equivalent benefits to its players.  In the
event that a player qualifies for benefits
under this section, such benefits will be
equivalent to those benefits paid under the
compensation law of the state in which his
Club is located.

*             *             *

*Section 3*. Arbitration:  In any state where
a Club (e.g., Miami Dolphins/Florida) has
legally elected not to be covered by the
workers' compensation laws of that state,
the equivalent benefit, if any, to which a
player may be entitled under this Article
will be determined under the grievance
procedure of Article IX (Non-Injury
Grievance).

*        *        *

*Section 6.* Preservation of Rights:  The
NFLPA and the Clubs preserve their prior
positions with regard to the legality of
workers' compensation offset provisions
under state law, and nothing in this Article
shall prevent any player from claiming that
an offset provision is not legally binding
upon him or prevent any Club from asserting
that an offset provision is legally binding
upon a player.  In addition, neither party
nor members of the NFLPA's bargaining unit
will claim that the other party's agreement
to this Article or the revised NFL Player
Contract appended hereto affects the rights
set forth above.


## NFLPA POSITION


The NFLPA asserts that the Clubs are not entitled to a
dollar-for-dollar offset under the plain terms of the
arbitration decisions interpreting Paragraph 10 of the NFL
Player Contract.  In addition to Freeman, the NFLPA cites two
earlier decisions:  Wandler v. Minnesota Vikings (Volz 1990) and
Green v. Washington Redskins (Stark 1992).  Each of these cases
found the purpose of Paragraph 10 was to avoid "double dipping"
during the period in which a player is receiving compensation
under his contract or the CBA by permitting a time offset only.
The same ruling was thereafter applied in Donald Smith NFL Arb.
(Malka 1996), aff'd Donald Smith NFL Arb. Appeal (Kagel 1997).
No arbitrator has since disagreed.

The NFLPA contends that _Freeman_ and the other relevant arbitration decisions have become part of the CBA and are binding on all Clubs.  Article II, Section 1 makes it clear that there is a uniformity rule.  All players have to be treated alike, and all Clubs have to be treated the same.  Article IX, Section 8 specifically provides:

> The decision of the arbitrator will constitute full, final and complete disposition of the grievance, and will be binding upon the player(s) and Club(s) involved <u>and the parties to this Agreement</u>....
>                     (Emphasis added.)

All Clubs are parties to the CBA.  The preclusive effect of such arbitration is also required by basic principles of federal labor law.  Here, not only has Paragraph 10 never been annulled, it was twice ratified and reaffirmed by the parties when the 1993 CBA was extended after the _Freeman_ decision without any change to Paragraph 10.  _Freeman_ is the law of the shop, fully binding on each NFL Club, and state and federal courts and administrative bodies are bound to follow it as such.  Moreover, the issue of whether the holding in _Freeman_ is the law of the shop and binding on all of the parties to the CBA is a decision for the arbitrator, not for the courts.

The NFLPA insists that _Freeman_ is indistinguishable from the present consolidated grievances.  Clearly, Arbitrator Kagel held that the time offset in Paragraph 10 governed all compensation payable to a player under any provision of the CBA

9                        NFLPA/NFL
                                                         WC Offset

or NFL Player Contract.   Indeed, that result is required by the
plain language of Paragraph 10.   It makes no difference that in
the present consolidated case the Clubs reduced the workers'
compensation award, not the injury benefit, because the CBA
provides that injured employees are entitled to both contractual
injury benefits and workers' compensation.   See NFLPA v. Dallas
Cowboys and Houston Texans (Das 2005), hereinafter referred to
as Texas Workers' Comp.

        The NFLPA maintains that arbitration decisions
interpreting Paragraph 10, like Freeman, preempt inconsistent
state laws.[1]   In particular, Texas Workers' Comp establishes that
where a state workers' compensation law conflicts with a
provision of the CBA, the CBA must control.   The NFL also cites
Tampa Bay Area NFL Football, Inc. v. Jarvis, 668 So. 2d 217
(Fla. Dist. Ct. App. 1996), which it states held that a dollar-
for-dollar workers' compensation offset provision in Florida law
was preempted by the limited time offset provision in Paragraph
10 of the NFL Player Contract.   Moreover, as in Texas Workers'
Comp, it is proper and appropriate for this arbitrator to decide
the preemption issue.

        The NFLPA asserts that the "Preservation of Rights"
provision in Article LIV, Section 6 of the CBA merely preserves
the parties' prior positions concerning the constitutionality
and preemption of state offset laws.   This is clear from the

---

[1] The NFLPA relies on the *Machinists* preemption doctrine.   See
Lodge 76, Int'l Ass'n of Machinists and Aerospace Workers v.
Wis. Employment Relations Comm'n, 427 U.S. 132 (1976).

text and bargaining history of this section.  Nothing in this
section makes state offset laws part of the CBA, or vests state
tribunals or legislatures with the right to interpret or modify
the limited time offset provided for in Paragraph 10 of the NFL
Player Contract.  That provision, like the rest of the CBA,
remains subject to the exclusive jurisdiction of the parties'
arbitrators, who have conclusively decided what its meaning is.
Only they can decide what Paragraph 10 means.  Certainly, the
parties did not agree to delegate to the 23 states having NFL
Clubs the contractual "right" to interpret Paragraph 10, with
the end product being a patchwork of disparate decisions that
treat players unequally under a uniform CBA.

        The NFLPA requests the following remedy in this case:
(1) a damages award for any grieving player whose workers'
compensation benefits were reduced as a result of a Club
obtaining a greater offset than the time offset permitted by
Paragraph 10 of the NFL Player Contract; (2) a declaration that
Freeman establishes that Paragraph 10 is a time offset only, and
that it is a benefit or right to the player, as well as the Club
-- in that it defines the scope of the injury benefits provided
for in other provisions of the CBA -- and that Freeman is the
law of the shop, binding on all Clubs for salary continuance and
injury protection; and (3) a declaration that to the extent any
state statute purports to create a greater offset and,
therefore, diminishes a contractual benefit it is preempted.
The NFLPA stresses that it is not asking the arbitrator to order
state authorities to do anything, and it is not seeking an order

preventing or limiting the Clubs from making any arguments they
want in state proceedings.

The NFLPA also contends that the Clubs' argument that
these grievances are untimely insofar as they seek monetary
damages is without merit.  The source of the injury to the
affected players was not the Club's arguing for a greater offset
than that provided in Paragraph 10, but the granting of an award
by the state tribunal which permitted such an offset and,
thereby, reduced the player's contractual injury benefit.  In
the case of all players, except Peter and Kerner, the grievance
was filed within 45 days of such an award, and, therefore, was
timely under Article IX, Section 2.  In Peter's case, there are
no damages yet, as the parties in that workers' compensation
proceeding have put the case on hold.  In Kerner's case, the
NFLPA -- which is not a party in any of the state proceedings --
did not know of the decision within 45 days of the award, but
filed an amended grievance to include Kerner -- a former player
who could not file a grievance on his own -- in the New York
grievance within 45 days of when the NFLPA did learn of the
award.

## CLUBS POSITION

Initially, the Clubs argue that this arbitrator lacks
jurisdiction to resolve these grievances because they involve a
dispute over how state law should be interpreted and applied in
purely state law proceedings.  As recognized in Texas Workers'
Comp, state law, not the CBA, determines what benefits a player

who files a claim for workers' compensation benefits under state
law is entitled to receive.  Any dispute over how such a claim
is to be calculated, including the amount of any appropriate
offset, always has been presented to, and resolved by, the
respective state authorities.

In any event, the Clubs contend, the grievances are
meritless because the CBA does not guarantee players any minimum
level of workers' compensation benefits, but instead leaves the
players' entitlement to such benefits for determination solely
by state authorities in accordance with state law.

Paragraph 10 of the NFL Players Contract gives Clubs
the contractual right to be reimbursed for money paid to players
that the parties deem to be an "advance payment" of workers'
compensation.  Paragraph 10 confers no affirmative rights upon
NFL players that could be subject to violation.  Past
arbitration decisions have not created any player rights to a
minimum level of workers' compensation benefits under state law.
The holding in Freeman may be asserted as authority in a
subsequent NFL arbitration in which a Club seeks to reduce a CBA
benefit by the amount of a state workers' compensation award,
but it cannot be extended to preclude Clubs from arguing how a
claim for workers' compensation should be determined by state
authorities under state law.  Donald Smith followed the Florida
court's decision in Jarvis in interpreting Paragraph 10 to
provide a time offset under Florida law.  State decisions in
Ohio, Louisiana and Pennsylvania likewise considered Paragraph
10 in determining that laws in those states provided Clubs with

·13                           NFLPA/NFL
                               WC Offset

a full dollar-for-dollar offset for advance compensation paid to
players for their injuries.

        The Clubs insist this is not a case of *Machinists*
preemption.  A state's determination as to how a particular
workers' compensation award should be calculated under state law
does not in any way deprive a player of any collectively
bargained benefit.  The NFLPA's reliance on Freeman and the law
of the shop principles is inapposite.  The question is not
whether Freeman should be followed in a subsequent arbitration
involving substantially identical claims under the CBA, or even
whether that decision has become part of the CBA and may not be
relitigated.  The grievances at issue here do not concern a
claim, as in Freeman, for injury protection benefits under the
CBA.

        Neither Freeman nor any of the other arbitration
decisions cited by the NFLPA holds that Paragraph 10 only
permits a limited time offset and precludes a dollar-for-dollar
offset to workers' compensation.  Indeed, Arbitrator Kagel
himself issued two decisions prior to the 1993 CBA granting a
Club a dollar-for-dollar offset.  See Harris v. Los Angeles Rams
(Kagel 1989) and Miami Dolphins v. Bennett, et al. (Kagel 1990).

        The Clubs stress that since Freeman was decided in
1994, Clubs and players -- with the assistance of the NFLPA --
have been arguing in state proceedings over whether Freeman's
analysis should be adopted in determining the offset to be
provided under state law on the particular facts ·in issue.  This

shows that preemption does not apply, and that the practice
established under the CBA is that these issues are to be
resolved at the respective state level.

        Indeed, the Clubs argue, the Preservation of Rights
provision in Article LIV, Section 6 of the CBA protects the
Clubs' right to make offset arguments to state authorities.
Ever since this provision was included in the CBA in 1993, both
parties have routinely argued to state workers' compensation
authorities regarding the legality of workers' compensation
offset provisions under state law, as Section 6 expressly
authorizes.

        The Clubs assert that federal court decisions make
clear that a party to a CBA cannot obtain declaratory relief
precluding the other side from filing grievances or advancing
arguments that it believes already have been decided in
arbitration.  See, e.g., AG Communications Systems Corp. v.
Int'l Brotherhood of Electrical Workers, Local 21, 2005 WL731026
(N.D. Ill.).  Here the NFLPA seeks to bar the Clubs from ever
arguing about the offset issue not only in subsequent
arbitration, but even in a forum outside of the CBA under state
law.

        The Clubs contend that there is no obligation that a
state apply state law in a manner consistent with Arbitrator
Kagel's decision in Freeman.  State authorities are not bound by
Freeman in how they interpret Paragraph 10 in the context of
applying state workers' compensation statutes.  An arbitrator

cannot tell states how they should interpret and apply their own
state statutes.

       Finally, the Clubs maintain that to the extent the
NFLPA is seeking damages for the named players in these
grievances, the grievances are untimely.  The Clubs assert that
the conduct being challenged here is the argument the various
Clubs have made at the state level about the application of
state workers' compensation offset provisions.  The Clubs argue
that in each instance the NFLPA was well aware of that far more
than 45 days prior to the filing of the grievance.


                              FINDINGS


       In Freeman, the player had received an award of
workers' compensation benefits before he was found to be
entitled to injury protection benefits under the CBA.  After
concluding that he was entitled to injury protection, Arbitrator
Kagel granted the Club a time offset under Paragraph 10 of the
NFL Player Contract.[2]  In Freeman, the parties disagreed on
whether Paragraph 10 provided only for a time offset or for a
dollar-for-dollar offset.  Freeman squarely held that Paragraph
10 only provides for a time offset, and not for a dollar-for-
dollar offset.  While Freeman involved injury protection, not
salary continuance, neither the parties, nor Arbitrator Kagel

_____

[2] Freeman is consistent with the two prior decisions, Wandler and
Green, in which arbitrators granted a club a time offset,
although it does not appear that the issue of a time offset
versus a dollar-for-dollar offset was raised in either case.

appeared to see any distinction between those contractual
benefits for purposes of the offset allowed by Paragraph 10.
That is perfectly understandable given the language of Paragraph
10.

        Under the holding in <u>Freeman</u>, a Club which has paid
salary continuance and/or injury protection to a player who
subsequently receives an award of workers' compensation would be
entitled to be reimbursed on a time offset basis under Paragraph
10.  For purposes of Paragraph 10 it would not seem to matter
whether such a time offset was factored into the workers'
compensation award itself or was repaid by the player after
receiving an award that did not include such an offset.

        The Clubs have cited two other arbitration decisions
that preceded <u>Freeman</u>, both also decided by Arbitrator Kagel.
<u>Bennett</u> was a case decided under the special procedure
applicable to the Miami Dolphins who elected not to be covered
by the workers' compensation laws of Florida.  As Arbitrator
Kagel later stressed in <u>Donald Smith</u>, the ruling in <u>Bennett</u> was
that a Florida dollar-for-dollar offset statute applicable only
to professional athletes did not apply retroactively.  <u>Harris</u>
was decided on the basis of an individualized insurance
provision included in the player's contract which specifically
provided for a dollar-for-dollar offset.

        <u>Donald Smith</u> can be viewed as implicitly acknowledging
that a state law can legitimately provide for a different offset
than Paragraph 10 in determining the amount of workers'

compensation to be awarded under state law to a player who has
also received contractual benefits, such as salary continuance
and/or injury protection, when it states that Jarvis not Freeman
was the appropriate precedent to consider.  Donald Smith, like
Bennett, was decided under the special procedure applicable to
the Dolphins, which looks to Florida state law to determine the
"equivalent benefits" to be provided under Article LIV, Section
1.  Jarvis was a Florida court decision which held that,
although Florida law provided for a dollar-for-dollar offset in
the case of professional athletes, Florida law also would
enforce a contract to provide greater benefits than otherwise
mandated by law.  The court in Jarvis then read Paragraph 10 of
the NFL Player Contract as only providing for a time offset, and
determined that was controlling under Florida law.  As I read
Jarvis, it applies state law, which in this instance looks to
the parties' agreement to see if they have agreed to greater
benefits than those provided by statute.  There is no mention of
federal preemption in Jarvis.  The only citation is to an
earlier Florida workers' compensation decision.  Moreover, in
Jarvis the Florida court interpreted Paragraph 10 on its own,
without any reference to how that provision had been interpreted
in arbitration proceedings under the CBA.[3]

       Texas Workers' Comp held that the CBA does not define
what workers' compensation benefits a player is entitled to

_____

[3] In that case, of course, the Florida court's interpretation
coincided with the prior interpretation by Arbitrator Kagel in
Freeman.  Other courts in states such as Ohio and Pennsylvania
have interpreted Paragraph 10 as providing for a dollar-for-
dollar offset, contrary to the holding in Freeman.

receive under state law in a case where state workers'
compensation coverage applies.  That is a matter to be
determined under state law.  Texas Workers' Comp directed the
Texas Clubs not to require players to make an election between
contractual benefits guaranteed them under the CBA and workers'
compensation benefits under the Texas statute, even though the
statute directed the Clubs to do so, because that could place a
player in the position of waiving guaranteed contractual
benefits in order to receive workers' compensation benefits,
when the CBA clearly provides he is entitled to both.  The Texas
statute required an election be made only when the contractual
benefits were greater than the statutory benefits, and that part
of the state law was deemed to be preempted.

        Texas Workers' Comp involved an election imposed on
the players by the Clubs -- albeit in conformity with state law
-- not an offset.  That decision also recognized that the
arbitrator did not have the authority to determine what the
consequences of the decision would be in a state workers'
compensation proceeding.  That does not mean there would be no
consequences, but it does mean they would have to be determined
in a different forum.

        It is in the context of these prior NFL arbitration
decisions and the terms of the CBA that the issues raised in
this case must be decided.

        Freeman clearly decided that Paragraph 10 provides for
a time offset only.  Under Article IX, Section 8 the decision in

19                              NFLPA/NFL
                                WC Offset

Freeman is binding "upon the player(s) and Club(s) involved and
the parties to this Agreement", which includes the NFLPA, the
NFLMC and all of the Clubs.  As the NFLPA contends, the CBA
contemplates a uniform "law of the shop".  Freeman's
interpretation of Paragraph 10 is the precedent in this shop.
Taking into account that the parties have twice renewed the
terms of Paragraph 10 without change since Freeman was decided,
Freeman is the law of the shop and is binding as such on all of
the Clubs, including those involved in these grievances.

        There is a separate issue, however, as to whether
Paragraph 10 limits the right of a state to provide a greater
offset in determining what workers' compensation benefits a
player is entitled to under state law.  Article LIV, Section 6
makes clear that the parties agreed to disagree over the
legality of state offset provisions, and preserved their rights
to assert their respective positions on that matter.  In
particular they agreed that the parties' agreement to Article
LIV and to Paragraph 10 would not be the basis of any claim that
either party was precluded from making such an assertion.  As
the NFLPA has stated, the legality question involved two issues
-- the constitutionality of state offset laws that provided for
a greater offset for NFL players or professional athletes, and
whether Paragraph 10 preempted state statutes providing for more
than a time offset.

        The CBA does not guarantee any particular level or
amount of workers' compensation benefits, but rather provides
that injured players are entitled to receive workers'

compensation benefits -- whatever they might be -- in addition
to contractual benefits.  The legality of provisions of state
workers' compensation laws is a mater to be decided in the
appropriate state or federal forum, not arbitration under the
CBA.  The parties seemed to have recognized this over the past
12 years during which those issues have been litigated in such
tribunals.  While neither the NFLPA nor the NFLMC has been a
party to such proceedings, they both have participated in
raising the respective positions which they preserved the right
to do in Article LIV, Section 6.

        This arbitrator cannot grant the damages sought by the
NFLPA in this case without in effect granting the affected
players a greater award of workers' compensation benefits than
they were deemed entitled to by a state tribunal applying state
law, which is not within my authority to do.  Indeed, if the
NFLPA believed such damages were available through the grievance
and arbitration procedure of the CBA it is difficult to
understand why they waited 12 years during which other players
were similarly affected by state offset laws before seeking such
a remedy.

        The issue of preemption can arise in a state workers'
compensation proceeding in a variety of contexts.  A state law
may grant a dollar-for-dollar offset in state workers'
compensation proceedings, regardless of what the parties have
agreed to regarding offsets in the CBA.  A state law may grant a
dollar-for-dollar offset unless the CBA provides for a lesser
offset (i.e., a greater benefit), as in the Florida cases --

Jarvis and Donald Smith.  In the latter situation, it would seem
that preemption would only be an issue if the state tribunal
concluded that the CBA provides for a dollar-for-dollar offset,
which was not the case in the Florida cases.  A state law may
grant a dollar-for-dollar offset only where that is provided for
in the parties' contract -- which apparently is the law in North
Carolina.

        Where the application of state law turns on what is
provided in the CBA, there is an issue as to whether a state
tribunal is free to interpret a provision in the CBA -- in this
case Paragraph 10 -- on its own without regard to what
arbitrators have held or to the law of the shop as determined by
arbitrators.  In each of these instances, however, the
preemption issue is one to be decided by the courts.

        What can appropriately be done here, however, is to
issue a declaration that:  Freeman holds that Paragraph 10 of
the NFL Player Contract provides only for a time offset, and not
for a dollar-for-dollar offset; that this is a benefit or right
to the player, as well as the Club; and that this is the law of
the shop under this CBA and is binding on all the Clubs.  In
light of the position taken by some Clubs and/or their workers'
compensation insurers in state proceedings -- where they argue,
among other things, that Paragraph 10 provides for a dollar-for-
dollar offset and/or that Freeman is not the law of the shop or
binding on all the Clubs -- the NFLPA has a legitimate interest
in obtaining such a declaration because the parties have agreed
that the arbitrator, not a court or other tribunal, is to be the

                    22                    NFLPA/NFL
                                          WC Offset

final determiner of what a provision in the CBA means and what
constitutes the law of the shop.

AWARD

    1.  DECLARATION:  The decision in <u>Kyle Freeman v.
Oakland Raiders</u> (Kagel 1994) holds that Paragraph 10 of the NFL
Player Contract provides only for a time offset, and not for a
dollar-for-dollar offset; this is a benefit or right to the
player, as well as the Club; and this is the law of the shop
under this CBA and is binding on all the Clubs.

    2.  The NFLPA's request for other relief is denied for
the reasons stated in the above Findings.




                    _____
                     Shyam Das, Arbitrator

# EXHIBIT D

06/06/2007 09:19 FAX 2028570873 @002/002

SHYAM DAS
ARBITRATOR

RECEIVED MAR 15 2007

350 ARDMORE AVENUE
ARDMORE, PA 19003-1032

PHONE: 610-642-7662
FAX: 610-642-4011
dasarb@verizon.net

March 13, 2007

Special Master Stephen Burbank
Harvard Law School
129 Areeda Hall
Cambridge, MA  02138

Re:  NFLPA/NFL Workers Compensation
     Offset Grievances

Dear Special Master Burbank:

As requested by the parties, I am sending you two copies of my decision in the above-referenced non-injury grievances. The two copies are enclosed in the brown envelope provided to me by the parties to be used for this purpose. It is my understanding that you are to unseal the envelope and provide copies of the Award to both the NFLPA and the NFL Management Council on July 1, 2007.

Very truly yours,

Shyam Das

SD/snr

Enclosure

cc: (without enclosure)
    Richard A. Berthelsen, Esq.
    Brook F. Gardiner, Esq.

# AFFIDAVIT OF SERVICE

STATE OF NEW YORK     )
                               SS.:
COUNTY OF NEW YORK   )

DEBRA K. SENIOR, being duly sworn, deposes and says: I am not a party to the action, am over 18 years of age and am employed by the law firm of Dewey & LeBoeuf LLP in New York New York.

On the 17th day of June, 2008, I caused the attached DECLARATION OF ADAM J. KAISER IN SUPPORT OF NFLPA'S AMENDED PETITION FOR ORDER CONFIRMING ARBITRATION AWARD AND ENTRY OF JUDGMENT THEREON via Federal Express to the parties listed below at their address designated for service of papers, as follows:

Daniel L. Nash, Esq.
Stacey R. Eisenstein, Esq.
Akin, Gump, Strauss, Hauer & Feld, LLP (DC)
Robert S. Strauss Building
1333 New Hampshire Avenue, N.W.
Washington, DC 20036

DEBRA K. SENIOR<br>Lic. No. 1264305

Sworn to before me this
17th day of June, 2008

NOTARY PUBLIC

GEORGE SIKES WASHINGTON III
Notary Public, State of New York
No. 01SI6178661
Qualified in Suffolk County
Commission Expires December 03, 2011